IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA<br>　Plaintiffs<br><br>　　　　　Vs.<br><br>CHARLIE JOSE DIAZ-RIVERA<br>　Defendant | CRIM. NO. 21-cr-00490 (ADC) |

**REPLY TO RESPONSE IN OPPOSITION TO DEFENDANT´S MOTION TO SUPPRESS AND REQUEST FOR FRANKS HEARING**

**TO THE HONORABLE COURT:**

**COMES NOW** Manuel L. Morales-Schmidt, Esq., legal representative for **Charlie Jose Diaz-Rivera**, and respectfully states and prays as follows:

**I.　　INTRODUCTION**

The Government filed their Response in Opposition to Defendant's Motion to Suppress on July 7, 2022. Their opposition relies on four arguments: "(1) the search warrant established probable cause that firearms and controlled substances would be found in the entire residence, (2) the search warrant was sufficiently particular, (3) various exceptions to the particularity requirement for multiple unit structures apply, and (4) even if this Court finds that the search warrant was not sufficiently particular, the good faith exception to the exclusionary rule would apply because the magistrate judge was not intentionally misled."

In its discussion of the four arguments, the government depends on information apparently provided by Agent Alemán to the government directly since that information does not appear in the affidavit upon which the search warrant application was based (Ex. B Response). To facilitate

the evaluation of the filed documents, we shall address each argument in the same order as found in the government's Response in Opposition.

## II.  FACTUAL BACKGROUND

### A. Police Officers Receive an Anonymous Tip, Conduct Surveillance and Obtain a Search Warrant

The Government's motion refers to the confidential informant's call regarding the description of the unit and of the so called "Charlito". In several places of the motion, the government argues that the informant did not suggest the residence as anything other than a single residence. The description contained in the confidential call is a very limited one, it refers simply to the unit as "two level, painted in white, with an aluminum door, French-style windows and a bar gate". It does not mention, the bars at the first floor, the cistern, or the existence of a shed on the right side of the building (Ex. A) where the person observed as coming from the right side could have been coming from (instead of from the bottom floor). The informant does not mention either that the asphalt from the parking area leads all the way to the front of the bottom apartment (Ex. B), suggesting the use of that area to park independently from the street level unit.

The government then continues to relate the observations made by Officer Alemán but fail to discuss the description of the person observed. As included in the affidavit, that person was described as "a husky shirtless individual with swarthy skin, short blue jeans, a black belt, black sandals, black hair, and a black goatee." This description does not fit Defendant who was described by the informant as light olive skin, tall, thin with pepper hair and a goatee (tez trigueña clara, alto, Delgado, pelo canoso con chiva). When describing the third visit to the unit, the government makes an argument that the person observed coming from the right of the unit could be reasonably assumed to have exited the bottom level, i.e. the bottom apartment. This argument

is made in an effort to contend that the whole house was being used for illegal activity. What the government fails to consider is that there was a shed on that side of the house that could have been used to keep the alleged observed marijuana (Ex. A). This shed was visible from the location that Officer Alemán alleges to have used to see the blue cistern and the a/c unit, the location of the blue tarp in the photos provided with our Motion. (Ex. C). In addition, the person coming from the right could have already set the alleged marijuana in the area waiting for the Kia Forte to arrive, also a reasonable assumption, especially considering the short interval between the arrival of the Kia Forte and the appearance of the person holding the bag.

As a final argument the government contends that there was no indication that the entire house was not been used for illegal activity based on the informant and the surveillance. The contrary happens to be the truth, **there was no indication that the entire house was used for illegal activity**. The only observed illegal activity occurred in the street level unit (top floor) and the parking area. The affidavit does not include any mention of anyone entering or exiting the bottom apartment at any time. Agent Alemán willingly failed to mention to the magistrate the existence of the two separate units in the structure, even after another officer told him he should have obtained search warrants for both units.

### B. Police Execute the Search Warrant

As correctly stated in the government's Response, Agent Alemán was on site when the warrant was executed. Nonetheless, what the government fails to disclose is that after entering the top floor and not finding the Defendant there, he expressed, along with another officer, "Charlie no esta aquí, esta en el apartamento de abajo, busquenlo abajo" (Charlie is not here, he is in the downstairs apartment, look for him downstairs). Such expressions clearly state that they knew there was an independent apartment downstairs before executing the warrant. The warrant in their

hands did not include any mention of a downstairs apartment which should have made any experienced officer hesitate to enter the downstairs apartment with the warrant available, since there were clearly two independent units in the structure. The government places a lot of emphasis on the alleged statement that the whole structure belonged to him, a statement for which no record exists except for the note in the Search Record. Nevertheless, from the HSI interview it is clear the unit belongs to his mother and the downstairs apartment was being used by his girlfriend since he lived in Caguas. Contrary to the government's argument, the statement clearly delineates both floors as independent units.

### III.  ARGUMENT

#### A. The Search Warrant Established Probable Cause that Firearms and Controlled Substances Would Be Found only at the Top Floor.

While arguing about the existence of probable cause for the whole structure, again the government argues in relation to the person coming from the right side of the residence and the assumption that he exited from one of the doors that led to the bottom floor. It worth noting that the person seen coming from the right side of the structure is on outside and there is nothing to suggest he is coming from downstairs. An argument can be made also that the person was coming from the shed seen in Ex. A. Probable cause existed only for the top floor as no illegal activity was observed on the bottom apartment. The nexus element of probable cause exists only for the top unit, the evidence relevant to the probable criminality was located in the top unit. All the illicit activity occurred outside of the unit or while entering the top unit. The warrant should have been particularized for the top unit as there were clear signs of two independent units in the structure.

It must be stated that the government argues that the whole outdoor area of the residence was being used for the illicit activity with no demarcations (e.g. such as separate driveway,

multiple gates different numbers on doors) to indicate the residence split. This argument fails to consider the driveway on the left side of the unit that ends exactly in front of the gated entrance to the downstairs apartment (Ex. B). It also ignores the windows, gate and door to the downstairs apartment clearly seen in Ex. B as well as in the photos included with our Motion to Suppress.

### B. The Search Warrant Was NOT Sufficiently Particular

The government repeats their argument that there was no indication that the residence contained a separate living area on the bottom floor. Such argument fails when confronted with the clear evidence that there was an a/c unit for that floor, a separate entrance to the apartment with its gate, a driveway to the front of that entrance, and the existence of two connections for independent electrical meters. The government argues that Agent Aleman could not see the electrical meter box from the front of the structure because it was covered by bushes. As we will present shortly, that is false.

The government states that Agent Aleman went to the area with the blue tarp in shown in Photo No. 4 in our Motion to Suppress, and from there he was able to observe the blue cistern and the a/c unit. Obviously, he had to get out of the vehicle to reach the area indicated. This argument is made to counter our assertion that Agent Aleman had to have gone into the driveway to see what he describes regarding the blue cistern, a/c and windows. Nevertheless, the affidavit by Agent Aleman makes no mention that he got of the vehicle and was able to observe those things from that particular position.

Regardless, either from the now alleged position or where we claimed in our Motion he was standing to observe what he described, he would have seen the electric meter box with the two connections. The photo contained in Ex. C was taken from the exact spot that Agent Aleman claims he was standing to view the cistern. From that location you could clearly see the electric

meter box with the two openings for the meters as well as the shed at the end of the right-side driveway. Agent Aleman willingly left out these details as well as the driveway to the downstairs apartment in his affidavit which would have been sufficient for the magistrate judge to understand there were two independent units in that structure.

Government relies on *U.S v Whitney*, 633 F. 2d 902, 908, to argue the circumstances are similar as instant case. In *Whitney*, the officers learned about the existence of two independent apartments after the entrance into the house because there were no visible signs of there being two apartments from the outside since it was only after a person entered the unit that the apartments could be seen. In instant case, there visible exterior signs of the existence of two apartments that Agent Aleman chose to ignore. Government also cites *Maryland v. Garrison*, 480 U.S. 79,85 (1987) to sustain their position. Again, the facts are very different from instant case. The separate units were on the third floor but entrance to the building was through the front door. Contrary to the present situation, there were no indications of separate apartments.

As argued by the government, "[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or **had a duty to discover and disclose, to the issuing Magistrate**." (supplied emphasis) *Garrison* at 85.

The fact that there was only one electric meter installed does not invalidate the existence of two independent apartments. The downstairs apartment could have been waiting for electrical service connection or have had its service disconnected for lack of payment, but the apartment would still be independent from the top floor. An investigation with LUMA would have shed light on the situation since that installation of the meter box requires approval by LUMA or PREPA for it to have been served. Agent Aleman did nothing regarding this and kept the information from the Magistrate.

### C. There Was NO Probable Cause to Search the Entire Residence; The Targets of the Investigation Did NOT Have Access to the Entire Residence; Officers COULD NOT Reasonably Believe that the Premises HAD Only A Single Unit

Government contends that even if Agent Aleman knew or should have known the structure was a multi-family residence the warrant would be valid because (1) there was probable cause to search each unit, (2) the targets of the investigation had access to the entire structure or (3) the officers reasonably believed that the premises had only a single unit. *U.S. v Johnson*, 26 F.3rd 669, 694 (7th Cir. 1994). None of the exceptions apply in instant case. The argument that the informant stated the whole residence was being used, not a single floor, to store drugs and firearms, lacks merit. The informant barely made a description of the unit from the outside saying it had two levels but did not describe any other particular features of the unit, especially those regarding the downstairs apartment. Again, the government argues about the lack of indication of separation between the units thus ignoring the existence of the driveway to the front of the downstairs apartment. In its argument that Agent Aleman saw a person coming from the right side of the property, the government seems to concede that Agent Aleman knew there was an independent downstairs unit and because it could be assumed that the person came from there, he had access to the entire residence. The trouble with such a position is that Agent Aleman did not observe at any time any person entering or leaving the downstairs apartment. Thus, there is no probable cause to search both levels. The search application may have been for a two-story residence, but Officer Aleman withheld information from the Magistrate that clearly stated the existence of two units, therefore, contrary to the government's assertion, the Magistrate was not made aware of the structure of the unit and was misled to issue a warrant as if it only were a single unit.

With regards to the access to the entire structure, we repeat the same arguments stated above regarding the fact that no observation was made of anyone entering the downstairs apartment

at anytime during the investigation. Defendant clearly stated in his interview, that the structure belonged to his mother and his girlfriend was living in the downstairs apartment. Therefore, it cannot be argued that he or the persons observed had control of the entire structure.

As to the third exception, sufficient evidence has been provided in sections II.A and II.B to establish that there were visible signs of the existence of two independent units and the falsehood of Agent Aleman's statements in his affidavit. There is also evidence that while executing the warrant, officers were aware of the existence of the two apartments, which should have alerted experienced officers to lack of validity of the warrant. There is no reason to believe that the informant had ever been inside the property, his description clearly fits only what is visible from the top of the street.

### D. If the Court Finds Agent Aleman Should Have Known the House was a Multi-Unit Dwelling, the Good Faith Exception Does Not Apply.

"The purpose of the exclusionary rule 'is to deter future Fourth Amendment violations'" *U.S. v. Sparks*, 711 F.3d 58, 63 (citing *Arizona v. Gant*, 556 U.S. 332, 338 (2009). It is precisely the need to deter PRPD from continually acting the way they did that requires exclusion of the evidence without applying the good faith exception. PRPD does this (fail to disclose the existence of independent apartments or dwellings) continually and a determination to exclude this evidence will deter these actions in the future. Undersigning attorney has been part of several suppression hearings with the same characteristics as instant case. Even though, local Courts have clearly established theses violations will result in suppression, now they are attempting to have Federal Courts validate these irregular and illegal procedures. It is necessary for this Court to make a clear statement that violations of the Fourth Amendment, such as this, will not be tolerated.

The agents that executed the warrant included Officer Aleman who knew the information

he withheld from the Magistrate and knew that the warrant should have been issued for only the top floor. There can be no good faith when the officer that misled the Magistrate was present during the execution of the warrant. In addition, as previously stated the officers were aware there were two apartments and shouted that Defendant was in the downstairs one.

When this Court determines that Agent Aleman knew or should have known that the structure was a multi-unit dwelling, the good faith exception does not apply because the benefits of suppression outweigh its costs. See *Davis v. United States*, 564 U.S. 229 (2011).

## IV.   THE COURT SHOULD GRANT AN EVIDENTIARY HEARING OR A FRANKS HEARING

When a Defendant challenges the existence of probable cause and asserts that the information was presented to a Magistrate knowing it to be false or with reckless disregard for the truth, a Franks Hearing is warranted. Particularly when the information omitted is material to the determination of the Magistrate. An evidentiary or Franks Hearing is warranted when, as in instant case, the Motion to Suppress include definite, specific, detailed and nonconjectural information to question the validity of the search. The Motion to Suppress as well as this Reply clearly establishes what Officer Aleman saw from the positions where he was located during his investigation. There are no hypothetical arguments, everything is based on actual facts and the clearly intentional withholding of said information by Agent Aleman. Short of a confession by Agent Aleman that he willingly withheld the information, there is sufficient evidence to prove that Agent Aleman intentionally misled the Puerto Rico Magistrate issuing the warrant. Defendant has met the burden to merit a Franks Hearing in instant case. Therefore, we stand by our request that a Franks Hearing be held.

**WHEREFORE**, Defendant Charlie José Díaz-Rivera respectfully requests that the Court Orders that all evidence seized on December 15, 2021 from the execution of the invalid warrant be suppressed along with any evidence that constitutes the fruit of the poisonous tree pursuant to the 4th Amendment of the U.S. Constitution and applicable case law.

**I HEREBY CERTIFY** that on this same date, a true and exact copy of this document has been filed using the CM/ECF system and that the government and all counsel of record will be notified a copy of this motion by said system.

**RESPECTFULLY SUBMITTED,** in San Juan, Puerto Rico, this 14th day of July 2022.

S/*Manuel L. Morales Schmidt*
**Manuel L. Morales-Schmidt**
USDC-PR#301608
Urb. Sta. Cruz
Esteban Padilla #47 Ste. 1-A
Bayamón, P.R. 00961
Tel.: (787) 993-2109
Fax: (787) 946-1767
lcdo.manuelmorales@delgado-morales.com