**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA**

**v.**

**CHARLIE JOSE DIAZ-RIVERA,**

**Defendant,**

**Crim. No. 21-490 (ADC)**

## OPINION AND ORDER

Before the Court is the Report and Recommendation issued by the Magistrate Judge on December 9, 2022, recommending that this Court deny defendant's motion to suppress. **ECF No. 47** ("R&R"). For the reasons explained below, the Court **ADOPTS** the R&R's recommendations, **OVERRULES** petitioner's objections to the R&R, and **DENIES** petitioner's motion.

## I.      Factual and Procedural Background

On June 14, 2022, defendant Charlie José Díaz-Rivera ("defendant") filed a motion to suppress evidence seized by police officers during the execution of a search warrant on December 15, 2021. **ECF No. 29** ("Mot."). Through his motion to suppress, defendant attacks the validity of the search warrant on December 14, 2021 by a state magistrate. The object of the search warrant was a two-story structure located at the end of a downward sloping dead-end street located in the Tome Ward of Guaynabo, Puerto Rico (hereinafter, the "Tome

Property"). The search warrant authorized Puerto Rico Police Department ("PRPD") officers to search and seize "everything related to violations of the weapons act and the controlled substances act." **ECF No. 34-2** at 7.

According to the post-search report prepared by the PRPD, police officers arrived at the Tome Property in the early hours of December 15, 2021. They executed the warrant and searched both floors of the Tome Property, seizing several firearms, ammunition, monies, and different types of drugs. Three individuals were found in the top floor but disclaimed ownership of the Tome Property. Defendant was found in the bottom floor and indicated that he was the owner of the Tome Property. **ECF No. 34-5**. The United States ("government") charged defendant in a six-count indictment with illegal possession of firearms and ammunition by a prohibited person, possession of a machinegun, possession of firearms, ammunition, and a machinegun in furtherance of a drug trafficking crime, and illegal drug possession with intent to distribute. *See* **ECF No. 20.**[1]

Defendant contends that the evidence was seized in violation of the Fourth Amendment of the United States Constitution, U.S. Const. amend. IV. Specifically, defendant argues that the search warrant is lacking in specificity as to the property to be searched because it incorrectly described the Tome Property as a single-unit residence, when in fact it is made up of two

---

[1] Specifically, the superseding indictment includes a total of six counts for violations of 18 U.S.C. § 922(g)(1) (Prohibited Person in Possession of Firearms and Ammunition: Felon), 18 U.S.C. § 922(o) (Possession of a Machinegun), 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Possession with Intent to Distribute Controlled Substances), 18 U.S.C. § 924(c)(1)(A)(i) (Possession of Firearms in Furtherance of Drug Trafficking Crime), and 18 U.S.C. § 924(c)(1)(B)(ii) (Possession of a Machinegun in Furtherance of a Drug Trafficking Crime). *See* **ECF No. 20**.

independent dwelling units—a top-floor and a bottom-floor unit. He blames PRPD Agent Eli

Alemán-Santana ("Agent Alemán") for this omission, positing that Agent Alemán knew or

should have known this from the information that became known to him as a result of his

surveillance of the property prior to the request for a search warrant. Defendant asserts that

Agent Alemán should have determined that the Tome Property was a multi-unit dwelling,

which required him to demonstrate independent probable cause to search each unit. Because

Agent Alemán failed to further investigate whether there were separate units and failed to

inform the state magistrate who issued the warrant of this fact, defendant argues that the state

magistrate was misled to find probable cause to search the entire Tome Property, all which

makes the search and seizure contrary to the Fourth Amendment. U.S. Const. amend. IV.

The matter was referred to United States Magistrate Judge Giselle López-Soler, who

proceeded to receive an opposition from the government as well as a reply from defendant. *See*

**ECF Nos. 34** ("Opp'n") and **38** ("Reply"). The Magistrate Judge held an evidentiary hearing on

November 3, 2022, in which she received testimony from Agent Alemán and for which a

transcript was prepared. *See* **ECF Nos. 46** ("Tr.").[2]

Before the Court is the resulting R&R issued by the Magistrate Judge on December 9,

2022, recommending that this Court deny defendant's motion to suppress. The Magistrate Judge

determined that from the information available to him at the time he submitted his sworn

---

[2] The Magistrate Judge also heard testimony from PRPD Agent Gustavo Ortíz-Fernández ("Agent Ortíz"), who accompanied Agent Alemán during the surveillance of the Tome Property.

statement in support of the request for a search warrant, it was reasonable for Agent Alemán to conclude that the Tome Property was a single-unit structure. *See* R&R, **ECF No. 47** at 6-8. Furthermore, the Magistrate Judge found that the good-faith doctrine would operate under these circumstances to preclude the suppression of the seized evidence even assuming that the search warrant lacked specificity as to the property to be searched. *Id.*, at 8-9. Finally, the Magistrate Judge denied defendant's request for relief under *Franks v. Delaware*, 438 U.S. 154 (1978), concluding that defendant had not made a substantial showing that Agent Alemán had omitted or misstated a material fact or had otherwise intentionally or recklessly misled the state magistrate in the issuance of the search warrant. *Id.*, at 9-10.

Defendant filed several objections to the R&R on March 23, 2023. **ECF No. 53** ("Objs.").[3] The Government responded to those objections on April 5, 2023. **ECF No. 54** ("Resp."). The Court now proceeds to review *de novo* those "properly objected" portions of the R&R. Fed. R. Civ. P. 72(b)(3).

## II.    Standard of Review

United States Magistrate Judges are granted authority to make recommendations on pretrial matters dispositive of a charge or defense, while the ultimate resolution of motions such as motions to suppress evidence remains at the discretion of the presiding judge. *See* 28 U.S.C. § 636(b); Fed. R. Crim. P. 59(a) and (b)(1). Any party adversely affected by the recommendation

---

[3] The Court considered these objections even though they were filed outside the 14-day period provided by Fed. R. Civ. P. 72(b)(2) and L. Civ. R. 72(d). **ECF No. 52**.

issued may file written objections within fourteen (14) days of being served with the report and recommendation. Fed. R. Crim. P. 59(b)(2). A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop*, 389 F. Supp. 2d 189, 191–92 (D.P.R. 2005) (citing *United States v. Raddatz*, 447 U.S. 667, 673 (1980)). "The district court need not consider frivolous, conclusive, or general objections." *Rivera–García v. United States*, Civ. No. 06–1004 (PG), 2008 WL 3287236, *1 (D.P.R. Aug. 7, 2008) (citing *Battle v. U.S. Parole Comm'n*, 834 F.2d 419 (5th Cir. 1987)).

Moreover, to the extent the objections amount to no more than general or conclusory objections to the report and recommendation, without specifying to which issues the party is objecting, or where the objections are repetitive of the arguments already made to the magistrate-judge, "a *de novo* review is unwarranted." *Id*. "Instead, the report and recommendation is reviewed by the district judge for clear error." *Id*. (citing *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) ("It is improper for an objecting party to ... submit[ ] papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge. Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a R & R.")); *see also Pabón-Mandrell v. United States*, 91 F. Supp. 3d 198, 201 (D.P.R. 2015) (*de novo* review unwarranted where objections are repetitive of the arguments already raised before the magistrate judge).

In conducting its review, the Court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate-judge." 28 U.S.C. § 636(b)(1); *see also, Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247 (1st Cir. 1985); *Alamo Rodríguez v. Pfizer Pharma., Inc.,* 286 F. Supp. 2d 144, 146 (D.P.R. 2003). Hence, the court may accept those parts of the report and recommendation to which the party does not object. *See Hernández–Mejías v. General Elec.,* 428 F. Supp. 2d 4, 6 (D.P.R. 2005) (citing *Lacedra v. Donald W. Wyatt Detention Facility,* 334 F. Supp. 2d 114, 125–26 (D.R.I. 2004)). The Court, however, "is not required to make separate findings of fact or issue an opinion setting forth its own reasoning." *U.S. v. Bach*, 388 F. App'x 2 (1st Cir. 2010) (citing *Jonco, LLC v. ALI, Inc.*, 157 F.3d 33, 35 (1st Cir. 1998).

## III.   Discussion

Defendant raised several objections to the R&R: some objecting specific findings of fact (which, he contends, are either incorrect or unsupported by the evidence presented during the hearing) and others objecting to the above-summarized legal conclusions. The Court will first turn to the objections regarding the findings of fact.

### A.  Defendants' Objections to the Magistrate Judge's Findings of Fact

Defendant's factual objections, for purposes of efficiency, are summarized as follows:

(1)     The Magistrate Judge erred in concluding that Agent Alemán testified that on December 5, 2021, during a surveillance visit to the property at issue, he could "observe the two stories of the Tome property, as well as an entrance from the side (the left side) of the bottom floor of the Tome Property," and that he "had clear visibility to the front of the Tome Property," all from a parked car. *See* Objs., **ECF No. 53** at 4; R&R, **ECF No. 47** at 2. Defendant also takes issue with the R&R stating

that Agent Alemán "turned… in a nearby driveway" during this visit. *See* Objs. **ECF No. 53** at 4.

(2)     The Magistrate Judge erred in describing the sworn statement submitted by Agent Alemán in support of the search warrant as "consistent with his testimony under oath" because the sworn statement did not contain additional information he revealed during his testimony (for example, the existence of a barred doors and entrance in the lower level). *Id.*, at 4-5.

(3)     It was during the execution of the search warrant that Agent Alemán "learned that the Tome Property had what appears to be a separate living space in the bottom floor." *Id.*, at 5. Defendant argues that Agent Alemán knew or should have known that the Tome Property had two independent living areas and that he so admitted in cross-examination. *Id.*

(4)     Defendant challenges the Magistrate Judge's credibility determination as to Agent Alemán's testimony to the effect that he could not tell whether there was one or two electrical meters in a column to which he did not have a direct view. *Id.*, at 6.

(5)     That Agent Alemán's affidavit contains false information when asserting that the Property Registry indicated that the property was owned by defendant. Defendant asserts that, as determined at the hearing, Agent Alemán only performed a property records search "about six months after the search warrant was obtained" and "accepted that he did not attempt to verify with the municipality of Guaynabo or any other government agency the name of the owner or the nature of the structure" to corroborate whether it was a single or multi-unit dwelling. *Id.*

Evidently, the bulk of defendant's factual objections pertain to the Magistrate Judge's determination that Agent Alemán credibly described the results of his surveillance of the Tome Property and the information available to him at the time he subscribed the sworn statement in support of the search warrant. In the end, defendant essentially seeks a finding that Agent Alemán's testimony was not credible and that his sworn statement left out information that

would have affected the state magistrate's determination of probable cause to search the entire Tome Property.

The Court cannot reject the Magistrate Judge's credibility determinations without holding a *de novo* hearing of its own—a decision that is ultimately left to its sound discretion. *See United States v. Raddatz*, 447 U.S. 667, 681 n. 7 (1980); *United States v. Hernández-Rodríguez*, 443 F.3d 138, 148 (1st Cir. 2006). After all, "[i]f the Magistrate system is to be effective, and if profligate wasting of judicial resources is to be avoided, the district court should be spared the chore of traversing ground already plowed by the Magistrate" unless the Court finds it necessary to do so. *See González-Ramos v. Empresas Berrios, Inc.*, 360 F. Supp. 2d 373, 376 (D.P.R. 2005) (citing *Sackall v. Heckler*, 104 F.R.D. 401, 402-03 (D.R.I. 1984)). But the Court "generally will not disturb the credibility determinations of a magistrate judge." *United States v. López-Ortíz*, 648 F. Supp. 2d 241, 249 (D.P.R. 2009); *see also, United States v. López-Torres*, Crim. No. 17-0582, 2022 WL 3443811, *5 (D.P.R. Aug. 16, 2022). "To require the district court to conduct a second evidentiary hearing whenever either party objects to the magistrate judge's credibility finding would frustrate the plain objective of Congress [in 28 U.S.C. § 636(b)(1)] to alleviate the increasing congestion in district courts." *United States v. Cadieux*, 295 F. Supp. 2d 133, 135 (D. Me. 2004). On the other hand, "a district judge need not hear the live testimony of a witness in order to *accept* the credibility determination of a magistrate judge." *Hernández-Rodríguez*, 443 F.3d at 147–48 (citing *Raddatz*, 447 U.S. at 680-81 (1980)).

After reviewing the hearing transcript, the exhibits presented by the parties in their filings, as well as those admitted as evidence during the hearing, the Court finds no reason to depart from the Magistrate Judge's determination of Agent Alemán's credibility or from the objected findings of fact. The Court notes that Agent Alemán was subject to a thorough direct examination and to cross-examination and re-direct, for approximately two-and-a-half hours. There, the Magistrate Judge had ample opportunity to observe his demeanor and make an informed credibility determination. Moreover, the record comfortably supports the Magistrate Judge's factual findings.

For instance, defendant's first objection (challenging the agent's observations from a "parked car") is meritless insofar as the R&R does not state that defendant made all his observations of the Tome Property from a parked car. *Compare* **ECF No. 53** at 4 *with* **ECF No. 47** at 2. The Magistrate Judge's finding is not that Agent Alemán was able to observe both the front and side of the Tome Property on December 5, 2021 from one single parked location, but that he did so in that same visit when he "approached the property by car, turned around in a driveway nearby… and parked…." R&R, **ECF No. 47** at 2. This much is supported by the hearing transcript and the exhibits. *See* Tr., **ECF No. 46** at 14:19-22; 16:8-19; *see also*, **ECF No. 45-1** at 15 (Exhibit 1-O), 19 (Exhibit 1-S).

Second, defendant complains that Agent Alemán provided through his testimony details or facts not included in the affidavit in support of the search warrant application. Suffice it to say that a review of the record reflects that Agent Alemán's sworn statement is consistent with

his testimony during the hearing. The alleged discrepancies are limited to the fact that his testimony, which was mostly elicited by questions from defense counsel, includes more details than the sworn statement. This is to be expected. Defendant argues:

> The sworn statement fails to detail the observations of the entrance and security bar in the downstairs apartment that would have led any reasonable person to understand there was an independent residence…. No mention was made of where [Agent Alemán] turned in the 'driveway' of the house next door and from where he allegedly saw the blue cistern and the a/c unit."

Objs., **ECF No. 53** at 5.

But, as a matter of fact, this additional information is not contradictory with that found in the sworn statement. *See* **ECF No. 34-3**. There, he describes the Tome Property as a "square two-story residence… built on stilts" and the left-bottom floor as having "glass windows, a blue water tank, and towards the end… an air conditioner on the wall." *Id.*, at 4. He also states that in his surveillance visit on December 5, 2021, he had "full visibility of the front area of the house" and does not refer to his visibility of the left side. *Id.* Also, surveillance was conducted from the "top of the hill" and the side. There is no contradictory information in these averments, and while it is true that the bottom-floor door is not mentioned in the sworn statement, that does not make the information inconsistent.[4]

In regard to the location of the electrical meter and whether it was visible or not, Agent Alemán explained how he could know, without directly observing it, that the Tome Property's electrical meter was behind a white column. He testified that his view of the column was

---

[4] The materiality of this omission will be addressed further below in relation to defendant's *Franks* hearing request.

obstructed by shrubs, but that he could see cables protruding from it and that this led him to conclude by inference that the meter was located behind the column. *See* Tr., **ECF No. 46** at 29:10 to 30:21; *see also*, **ECF No. 45-1** at 8 (Exhibit 1-H), 24 (Exhibit 2-E). The Magistrate Judge found the explanation credible: "Agent Alemán provided credible testimony to the effect that, even though he could see the electrical connection of the residence, he was unable during surveillance or before obtaining the search warrant to corroborate whether there was only one electricity meter for the Tome Property." R&R, **ECF No. 47** at 7. After examining the testimony and the photo exhibits submitted during the hearing, this Court sees no reason to depart from that determination.

Defendant also contends that Agent Alemán was not truthful when verifying ownership of the Tome Property. Defendant challenges Agent Alemán's testimony based on the government's submission in evidence of a screenshot of the CRIM's database, taken on June 16, 2022. Defendant's objection is clearly contradicted by Agent Alemán's testimony and evidence presented at the evidentiary hearing. Actually, defendant either deliberately or negligently conflates two separate events. It was the unrebutted testimony of Agent Alemán that while preparing his affidavit in support of the request for a search warrant, he searched and looked at the database for the CRIM.[5] The same reflected defendant's name as the property owner. At the hearing, a picture or screenshot of the CRIM database (showing defendant as the property's

---

[5] CRIM stands for the "Centro de Recaudación de Impuestos Municipales," a Puerto Rico government agency tasked with collecting property taxes.

owner) taken in June 16, 2022, was submitted. **ECF No. 45-3**. However, Agent Alemán explained that the screenshot had been taken "in preparation for the evidentiary hearing" (not when preparing the affidavit). *See* Tr., **ECF No. 46** at 76:12-16. Thus, defendant's assertions are misplaced and do not undermine Agent Alemán's credibility.

Clearly, defendant's objections amount to little more than disagreements with the Magistrate Judge's appreciation of the evidence. Under First Circuit precedent, "absent objective evidence that contradicts a witness's story or a situation where the story itself is so internally inconsistent or implausible that no reasonable factfinder would credit it[,]" there is no reason to undermine the Magistrate Judge's credibility determination. *See United States v. Sierra-Ayala*, 39 F.4th 1, 13 (1st Cir. 2022) (quoting *United States v. Guzmán-Batista*, 783 F.3d 930, 937 (1st Cir. 2015)). This Court's *de novo* review of the record leads it to conclude that the Magistrate Judge's determinations of fact are clearly supported by the testimonies and evidence on record. Defendant's objections to the Magistrate Judge's findings of fact are **OVERRULED**.

**B. Defendant's Objections to the Magistrate Judge's conclusion that Agent Alemán had no reason to know that the Tome Property was a multi-unit structure.**

The Court now turns to defendant's objections to the Magistrate Judge's conclusions of law. As a threshold matter, after a side-by side comparison of defendant's motion to suppress (**ECF No. 29** at 5-16) and his legal objections to the R&R (Objs., **ECF No. 54** at 7-18), it is evident that defendant has merely rehashed the same arguments already considered and ruled upon by

the Magistrate Judge. Save for the inclusion of some additional support based on Agent Alemán's testimony during the hearing, defendant's arguments are completely repetitive.

A party's objections to a Magistrate Judge's report and recommendation "are not to be construed as a second opportunity to present the arguments already considered by the Magistrate Judge." *Betancourt v. Ace Ins. Co. of Puerto Rico*, 313 F. Supp. 2d 32, 34 (D.P.R. 2004). Where objections are repetitive of the arguments already made to the Magistrate Judge, a *de novo* review is unwarranted. *Rivera-García v. United States*, Civ. No. 06-1004 (PG), 2008 WL 3287236 at *1 (D.P.R. Aug. 7, 2008) ("where a party's objections are simply a repetition of the arguments he made to the magistrate judge, a *de novo* review is unwarranted. Instead, the report and recommendation is reviewed by the district court for clear error."); *see also, Monfort-Rodríguez v. Hernández*, 286 F. Supp. 2d 119, 121 (D.P.R. 2003) (disregarding a party's objections where it merely "disagree[d] with the Magistrate's factual findings but offer[ed] nothing to bolster their objections except their own interpretation of the evidence" and did not "offer any new substantive arguments in favor of their position.").

Given defendant's repetitive arguments, the Court need not perform a *de novo* review of the R&R's legal conclusions. *See Rodríguez-González v. Astrue*, 854 F. Supp. 2d 176 (D.P.R. 2012) (citing *Rivera–García*, 2008 WL 3287236 at *1); *see also*, Fed. R. Civ. P. 72(b), Advisory Committee Notes to 1983 Addition (when no timely objection is filed, the Court reviews for "clear error on the face of the record."). Nonetheless, the Court has reviewed the record in detail considering defendants' objections and agrees with the Magistrate Judge's conclusions.

1.   **Whether it was reasonable for Agent Alemán to think that the Tome Property was a single-unit dwelling.**

Defendant's main challenge revolves around the Fourth Amendment's "particularity" requirement: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Particularity is a constitutional imperative with which search warrants must comply, its "manifest purpose [being] to prevent wide-ranging general searches by the police." *Unites States v. Vega-Figueroa*, 234 F.3d 744, 756 (1st Cir. 2000) (citing *United States v. Leon*, 468 U.S. 897, 963 (1984) (Stevens, J., dissenting). "The test for determining the adequacy of the description of the location to be searched is whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched." *Id.* (internal quotation marks and citations omitted). Nonetheless, "[a]n affidavit supporting a search warrant is presumptively valid." *U.S. v. McLellan*, 792 F.3d 200, 208 (1st Cir. 2015) (citing *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013).

When the place to be searched is a multi-unit structure, particularity requires "the police to 'specify the precise unit that is the subject of the search,' and 'the general rule is that a warrant that authorizes the search of an undisclosed multi-unit dwelling is invalid….'" *United States v. Mousli*, 511 F.3d 7, 12 (1st Cir. 2007) (quoting *United States v. Pérez*, 484 F.3d 735, 741 (5th Cir. 2007)). As relevant here, there are exceptions to the general rule regarding independent probable cause for multi-unit dwellings: "The police can validly search a multi-unit dwelling even if the

search warrant was only for a single-unit dwelling, provided the police reasonably believed that the dwelling contained only one unit." *Mousli*, 511 F.3d at 12 (citing *Maryland v. Garrison*, 480 U.S. 79, 85 (1987)); *see also*, *United States v. Pimentel*, No. CR 18-10452-PBS, 2019 WL 3767514 at *4 (D. Mass. Aug. 9, 2019), *aff'd*, 26 F.4th 86 (1st Cir. 2022) ("Reasonable mistakes in the description of the premises do not invalidate an otherwise valid warrant."). The question of whether this exception applies is not analyzed with the benefit of hindsight, but with "the information available to [the police officers] at the time they acted." *Id.*, at 12 (citing *Garrison*, 480 U.S. at 85).

> In the R&R, the Magistrate Judge observed that:
>
> [T]he issue posed by [d]efendant in this case is not so much an issue of lack of particularity but an issue of probable cause—there is no question that the warrant at issue described with reasonable certainty the property subject to the surveillance and to be searched… See [*United States v. Whitney*, 633 F.2d 902, 907 (9th Cir. 1980).] Defendant takes issue not with the description of the property to be searched but with the fact that it was not identified as a multi-occupancy unit and with the allege[d] absence of probable-cause to search the bottom floor of the Tome Property.

R&R, **ECF No. 47** at 5. For its part, although the government offers some resistance to defendant's description of the Tome Property as a multi-unit dwelling—one unit located in the top floor and one in the bottom floor—it largely proceeds to argue as if it were. *See, e.g.*, **ECF No. 34** at 9 ("At most, this residence can be characterized as a single residence with a basement apartment…."); **ECF No. 54** at 8 ("For all intents and purposes, it is [a multi-unit dwelling.]").[6]

---

[6] In any case, "[w]hether a dwelling constitutes a single- or multi-unit residence is a fact-intensive and situation-specific determination, and thus there are no hard-and-fast rules as to what category any particular dwelling falls into." *United States v. McLellan*, 792 F.3d 200, 212 (1st Cir. 2015). Because the issue is not seriously disputed and is

The question is thus whether Agent Alemán and the police officers executing the warrant reasonably believed, given the information available to them at the time the search warrant was issued and executed, that the Tome Property was a single-unit dwelling.

In considering this question, the Magistrate Judge recounted the elements of Agent Alemán's investigation of the Tome Property prior to the issuance of the warrant, namely:

- that he acted upon a tip provided by a reliable confidential informant ("CI") describing the property as a two-story residence;
- that the CI informed that the Tome Property was being used by various individuals to store drugs and firearms in connection with a shooting that occurred on December 1, 2021, that was part of an ongoing turf war for control of a drug point;
- that the CI had identified the owner of the drugs and firearms in the Tome Property as a man nicknamed "Charlito;"[7]
- that the CI's description of the location and appearance of the Tome Property—a single two-floor residence painted white with an aluminum door, French-style windows and a front gate—matched Agent Alemán's subsequent observations of the Tome Property;
- that the Tome Property was located in a high crime area;
- that Agent Alemán was aware of a door in the bottom floor of the Tome Property on its left side; and
- that he saw a person carrying a weapon coming out of the front door to receive a bag from an unknown individual on December 6 and that, on December 8, that same person came out from the right side of the structure carrying drugs and participating in a money and weapons exchange with another individual.

*See* R&R, **ECF No. 47** at 6-7. In addition, the Magistrate Judge credited Agent Alemán's testimony as to his inability to corroborate or see the Tome Property's electricity meter, of which there ended up being only one but with space for a second. *Id.* at 7. Moreover, the Magistrate

---

not necessary for the resolution of the motion to suppress, the Court will not opine on whether the Tome Property is or isn't a multi-unit residence but proceeds assuming that it is.

[7] The government identified "Charlito" as the defendant, Charlie José Díaz-Rivera. *See* **ECF No. 54** at 2 n. 2.

Judge also credited his testimony to the effect that the property looked like a single residence, has a single gate and entrance, had no visible mailbox during his surveillance, and none of the two doors were identified by numbers or letters indicating the existence of separate living quarters. *Id*. Finally, the Magistrate Judge took into account the fact that Agent Alemán's "ability to conduct the surveillance and remain at the Tome Property was limited due to the location of the property in a high crime area…." *Id.*, at 8.

But most importantly, as to the existence of the bottom-floor door that Agent Alemán saw during his surveillance, the Magistrate Judge reasoned:

> The mere fact that Agent Alemán may have been able to see an entrance to the Tome Property from the bottom floor (left side) is insufficient to conclude that he knew or should have known that the property was composed of two residences. It is more than reasonable to conclude that a two-story property of the size of the Tome Property could have more than one entrance. And from the distance shown in Exhibit 2-L [where he was able to observe the left side of the Tome Property on December 5, 2021] it would be almost impossible for the agent to be able to ascertain whether that on the left was a main entrance to a residence or a mere side entrance to the property.

R&R, **ECF No. 47** at 7; *see also*, **ECF No. 45-1** at 31 (Exhibit 2-L).

Of particular relevance to this conclusion is Agent Alemán's first surveillance visit on December 5, 2021. *See* Tr., **ECF No. 46** at 9:20-22. It was there where he was able to briefly observe the white column where the electrical meter was located, the left side of the bottom floor, and the adjacent elements (*i.e.*, blue cistern, bottom-floor door). *Id.*, at 16:6-20; 26:3 to 29:24. He testified that on this first surveillance visit, he drove his car down the straight, sloped dead-end street where the Tome Property is located. *Id.*, at 16:6-20. The Tome Property has a white main

gate with an orange column on the left side of the road. *See* **ECF No. 45-1** at 5 (Exhibit 1-E). This orange column is located in front of another white column which contains the number "9" and the property's electrical meter. *Id.*; *see also*, *id.*, at 23 (Exhibit 2-D). From Agent Alemán's testimony and photos taken of the location, it appears that this white column is obstructed by both the orange column and vegetation. Tr., **ECF No. 46** at 38:2-6; *see also*, *e.g.*, **ECF No. 45-1** at 1 (Exhibit 1-A), 5 (Exhibit 1-D), and 15 (Exhibit 1-O).

Agent Alemán testified that during this visit, as he was approaching the Tome Property, he turned left into an area (which for present purposes could be called a sort of "driveway") within an immediately adjacent property, backed up and turned the car, exited the sloped, dead-end street front-first, and parked the car at the top of the street from where he could surveil the front of the Tome Property. *See* Tr., **ECF No. 46** at 16:6-20; 26:3 to 29-24; *see also*, **ECF No. 45-1** at 19 (Exhibit 1-G), 31 (Exhibit 2-L). Notably, from the area where he turned the car (described as a "driveway" by the Magistrate Judge), he could partly observe the left side of the Tome Property and the bottom floor, as well as the blue cistern, the a/c unit, and the bottom-floor door behind iron bars. *Id.* However, he testified that he only remained there between five and six seconds, moving back up the street to park further away from the Tome Property. *Id.*, at 16:14-19.[8]

---

[8] Most of the surveillance performed on the Tome Property was done from a point on the top of the street. *See* **ECF No. 45-1** at 19 (Exhibit 1-S); Tr., **ECF No. 46** at 14:19-22; 35:16-18; 39: 7-8. This made it difficult or impossible to see the entirety of the white column from the surveillance point. *Id.*, at 28:8-10; 38:7-22.

Given the above, the Court agrees with the Magistrate Judge that it was more than reasonable for Agent Alemán to conclude that the side door was not an entrance to a separate dwelling. Many houses in Puerto Rico, particularly in hilly terrain, are constructed with a street-level floor and additional floors below. This type of construction is usually informal, and the bottom floors may be additions to the earlier constructed top floors (or vice versa). Under the circumstances laid out by the record here, the mere presence of a door on the side of the bottom floor of two-story residential structure is not overtly indicative of a separate, independent dwelling unit. The fact that the property was identified with a single number "9" lends additional support to the agents' conclusion that the Tome Property was a single, two-level residence.

In addition, defendant also points to a paved asphalt path or "driveway" that leads from the front of the Tome Property to the front of the bottom-floor door as indicative of the presence of an independent dwelling unit. *See* **ECF No. 38** at 4-5. But again, that is neither overt nor conclusive evidence of such. A reasonable person could assume that this paved space is meant for additional vehicle parking or a paved path to bring construction materials and other heavy items (such as a/c units and cisterns) to the back of the residence. Like the side door, this "driveway" is also not overtly indicative of the presence of an independent dwelling unit in the bottom floor.

The Court observes that the police *could* have engaged in additional corroboration of the assumption that the Tome Property was a single-unit dwelling. However, it would have most

likely had no effect. The property search did not result in any positive identification of an owner because the Tome Property is not segregated. *See* Tr., **ECF No. 46** at 43:11-13. The white column at the entrance has only one number "9"—not 9-A or 9-B—which suggests a single residence. *See id.*, at 70:5-11. Moreover, a public utility search for electricity billing records would have likely resulted in only one bill in that location given that there was only one meter in the Tome Property. *See id.*, at 70:15-19.[9] But more importantly, it would stretch the bounds of reasonableness to require that the police conduct an exhaustive investigation of a two-story dwelling located in a high crime area, described by a CI as a storage house for drugs and firearms, while in the middle of a dispute for control of a drug point. Under these circumstances, the police's investigation of the Tome Property, for purposes of obtaining a search warrant, was reasonable. *See United States v. Santana*, 342 F.3d 60 (1st Cir. 2003) (failure to investigate fully before submitting affidavit does not amount to recklessness); *United States v. Ranney*, 298 F.3d 74 (1st Cir. 2002) (same); *United States v. Mastroianni*, 749 F.2d 900, 910 (1st Cir. 1984) (same).

The Tome Property does not have overt external signs indicative of the existence of a second dwelling unit. Therefore, it was reasonable for Agent Alemán to assume that the Tome Property was a single-unit dwelling. The Court finds that the exception to the particularity requirement is met here and that the search warrant is valid.

---

[9] Defendant pushed back on this assumption. *See* **ECF No. 38** at 6 ("An investigation with LUMA [the electric utility company] would have shed light on the situation…."). However, as noted by the government, defendant did not "put forth any evidence from the public records that would clearly indicate that this was a multi-unit residence," either before, during, or after the suppression hearing. *See* **ECF No. 34** at 14.

> **2. The police officers' conduct in executing the search warrant would nonetheless be covered under the good-faith exception and suppression is unwarranted.**

Independent of the validity of the search warrant, the Magistrate Judge also concluded that the search of the Tome Property would still be valid under the Fourth Amendment because the police officers executing the warrant relied in good faith on the state court magistrate's finding of probable cause to search the entire Tome Property. *See* R&R, **ECF No. 47** at 8-9. The good-faith doctrine is an exception to the exclusionary rule, which requires that evidence obtained by searches and seizures in violation of the Fourth Amendment be inadmissible in court. *See United States v. Pimentel*, 56 F.4th 86, 90 (1st Cir. 2022). The good-faith doctrine reflects a balance between the costs and benefits of excluding evidence. *See Leon*, 468 U.S. at 922 ("We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."). However, the doctrine is qualified in that it "only saves searches 'that it was reasonable to believe were covered by the warrant….'" *Id.*, at 91-92 (citing *United States v. Leon*, 468 U.S. 897, 918 n.19 (1984)).

As summarized by the Magistrate Judge, the doctrine itself has three well-known exceptions: (1) when the affiant submitted false information or information that he would have known to be false except for a reckless disregard for the truth, (2) if the issuing magistrate was not neutral, or (3) if the affidavit was so facially deficient or clearly lacking probable cause that

the executing officers could not have reasonably presumed it to be valid. *See* R&R, **ECF No. 47** at 8 (citing *Leon*, 468 U.S. at 923 and *United States v. Capozzi*, 347 U.S. 327, 332 (1st Cir. 2003)).

The Magistrate Judge determined that the warrant "contained a sufficiently detailed description of the Tome Property… as that of a two-story residence" and that "the warrant authorized the search of the entire property—both the bottom and the top floor." R&R, **ECF No. 47** at 9. That much is easily corroborated by the text of the search warrant itself. *See* **ECF No. 34-2**, at 7. The Magistrate Judge also noted that Agent Alemán accompanied the police officers executing the warrant to identify the Tome Property but that the search was executed by other officers. R&R, **ECF No. 47** at 3. Importantly, the Magistrate Judge noted that the "executing officers first conducted a security sweep of the top floor and then a security sweep of the bottom floor" before the actual search began. *Id.*, at 9. According to Agent Alemán's testimony, which was not controverted at the hearing, the defendant was found in the bottom floor and identified himself as the owner of the entire Tome Property—not just the bottom floor dwelling. *Id.*, at 3-4, 9.

The Court sees no reason to differ from the Magistrate Judge's conclusions. The officers executing the search warrant relied in good faith that they were authorized to search a two-floor residence that was correctly identified by Agent Alemán. Upon performing a security sweep, the officers received confirmation from defendant that he was the owner of the entire Tome Property. Further, defendant does not directly attack the police officer's execution of the warrant and raised no objection to that effect, waiving any argument to the effect that the police officers

harbored any doubts about the scope of the warrant (which never happened).[10] Therefore, the Court finds that the good-faith doctrine would preclude the exclusion of the seized evidence even if the search warrant were to be considered overbroad.

### 3.        Defendant is not entitled to a *Franks* hearing.

Finally, on reply, defendant argued that, because Agent Alemán had "intentionally withheld information" and "intentionally misled" the state magistrate that issued the search warrant, he was entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). *See* **ECF No. 38** at 9. The Magistrate Judge concluded that such a hearing was unwarranted because, even after the suppression hearing, defendant had not made the requisite "substantial showing that a false statement or an omission of a material fact was made knowingly and intentionally, or with reckless disregard for the truth by Agent Alemán when applying for a search warrant in this case." R&R, **ECF No. 47** at 9. Neither did defendant "offer any evidence that could lead the Court to conclude that Agent Alemán had serious doubts as to the truth of his statements…." *Id.*

To warrant an evidentiary hearing under *Franks*, "a defendant must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless

---

[10] On reply, defendant argued in a single sentence that "while executing the warrant, officers were aware of the existence of the two apartments, which should have alerted experienced officers to [the] lack of validity of the warrant." **ECF No. 38** at 8. Defendant cited no authority or specific facts to support this argument and failed to include it in its objections to the R&R. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Davet v. Maccarone*, 973 F.2d 22, 31 (1st Cir. 1992) ("[C]laims not preserved by [an] objection [to a report and recommendation] are precluded on appeal.").

disregard for the truth, was included by the affiant in the warrant affidavit…. In addition… the allegedly false statement must be necessary to the finding of probable cause." *United States v. Centeno-González*, 989 F.3d 36, 50 (1st Cir. 2021) (citing *United States v. Graf*, 784 F.3d 1, 3 (1st Cir. 2015)) (internal quotations and alterations omitted). Furthermore, "the challenger's attack must be more than conclusory and must be supported by **more than a mere desire to cross-examine**. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations **must be accompanied by an offer of proof."** *Franks v. Delaware*, 438 U.S. at 171 (emphasis added). This requires, for example, that "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.*

It remains a fact that defendant did not offer any particularly compelling proof with his motion to suppress. Defendant's arguments were based on purported contradictions between Agent Alemán's sworn statement and the physical characteristics of the Tome Property, as characterized by defendant. His offer of proof consisted solely of photographs of the Tome Property from different vantage points, which he argued contradicted Agent Alemán's sworn statement. *See* **ECF No. 38** at Exhibits A to C (**ECF No. 38-1**). During the suppression hearing, defendant nonetheless questioned Agent Alemán thoroughly on the contents of his sworn statement and how he could observe what he testified having observed (as well as what he could not). Defendant did not submit a sworn statement of his own, nor did he present any witnesses to contradict Agent Alemán's testimony. The details and nature of the alleged contradictions were explored and weighed by the Magistrate Judge, and as explained above, she found that

any such contradictions did not rise to the level of invalidating the warrant. The Court is compelled to agree with the Magistrate Judge that defendant did not make the substantial showing required under *Franks*. More so, some of his challenges misconstrue the evidence presented.

But even if, for argument's sake, the Court were to consider that the omission from the sworn statements of the bottom-floor door and the space for a second electricity meter (which does not exist) constituted a sufficiently substantial showing that Agent Alemán knowingly, intentionally or recklessly omitted these facts in order to obtain the search warrant, the Court considers that they would nonetheless be immaterial to the determination of probable cause. Under *Franks*, for an omission to be material, it must be "necessary to the finding of probable cause." *See United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002) (citing *Franks*, 738 U.S. at 155-56). "With an omission, the inquiry is whether its inclusion in an affidavit would have led to a *negative* finding by the magistrate on probable cause." *Id.*, at 25 n. 4. As explained above, reasonable explanations abound for why Agent Alemán did not take these elements to be indicative of the existence of a second, independent dwelling unit. The Court likewise considers that neither element is an overt indication of the presence of a second dwelling unit. Therefore, even if they would have been included in the sworn statement, they do nothing to rebut the reasonable inference that a two-story house was being used to keep weapons and drugs.[11] In the

---

[11] The Court highlights that "there is no requirement that every shred of known information be included in a warrant affidavit" and that *Franks*' intentional or reckless standard is a high enough bar that the mere omission of details, without more, will not invalidate a search and seizure. *See United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015).

end, the inclusion of these elements in the sworn statement would not have altered the state magistrate's probable cause determination.

## IV.  Conclusion

The Magistrate Judge concluded that the search warrant did not violate the Fourth Amendment's particularity requirement, that Agent Alemán did not know or had reason to know at the time he subscribed his sworn statement in support of the search warrant that the Tome Property was anything but a single-unit residence, and that the search of the Tome Property and seizure of the evidence found therein would still be valid under the Fourth Amendment pursuant to the good-faith exception. After a *de novo* review, the Court finds that the Magistrate Judge correctly applied the law to the facts and committed no error in its appreciation of either.

For the foregoing reasons, the Court **ADOPTS** the Report and Recommendation's factual and legal determinations, **OVERRULES** petitioner's objections to the R&R, and **DENIES** petitioner's motion to suppress at **ECF No. 29**.

---

However, the Court nonetheless finds it appropriate to incorporate and repeat the First Circuit's admonition to law enforcement officers in *McLellan*:

> The best way to ensure that the Fourth Amendment's probable cause requirement is complied with is to meticulously comply with it. And meticulous compliance involves more than an agent's own judgment as to the ultimate importance of a piece of information to a judgment of probable cause. The agent also should, in the interest of both judicial economy and fairness, ask the further question, "Is this information so trivial, remote or irrelevant that no reasonable official could assign it weight in coming to a decision to issue the warrant?" Unless an affirmative answer can be given, the information should be included—even if, in context, its weight seems too slight to tip the balance away from a finding of probable cause.

*United States v. McLellan*, 792 F.3d 200, 210 n.6 (1st Cir. 2015) (cleaned up).

**SO ORDERED**.

At San Juan, Puerto Rico, on this 19th day of April, 2024.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**